```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
    CHRISTINA PARK,
                        Plaintiff,                              Civil Case No:
                                                                7:19-cv-4091
    -against-


    LINK SOLUTIONS, INC.,
    REBECCA BOONE, individually                                **COMPLAINT**
    RICHARD ROBITAILLE, individually,
    and KRISTEN MANGOLD, individually,
                                                                Plaintiff Demands a
                        Defendants.                             Trial by Jury

----------------------------------------------------------X
```

Plaintiff CHRISTINA PARK by and through her attorneys DEREK SMITH LAW GROUP, PLLC, hereby complains of Defendants LINK SOLUTIONS, INC., REBECCA BOONE, RICHARD ROBITAILLE, and KRISTEN MANGOLD, (collectively referred to as "Defendants,") upon information and belief as follows:

## NATURE OF CASE

Plaintiff, CHRISTINA PARK, complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII"), the Administrative Code of the City of New York and the laws of the State of New York, based upon the supplemental jurisdiction of this Court pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), and 28 U.S.C. §1367, seeking declaratory relief and damages to redress the injuries Plaintiff has suffered as a result of, *inter alia*, sex/gender discrimination, hostile work environment, retaliation and wrongful termination by Defendants.

1

## JURISDICTION AND VENUE

1. Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question under Title VII. The Court also has jurisdiction pursuant to 29 U.S.C. §2617; 28 U.S.C. §1331, §1343 and pendent jurisdiction thereto.

2. Additionally, the Court has supplemental jurisdiction under the State and City laws of New York.

3. On or about April 23, 2018, Plaintiff CHRISTINA PARK submitted a Charge of Discrimination to the U.S. Equal Employment Opportunity Commission ("EEOC"). The federal charge number is 520-2018-03448.

4. On or about November 6, 2018, Plaintiff CHRISTINA PARK submitted an Amended Charge of Discrimination to the EEOC for federal charge number 520-2018-03448.

5. On or about February 28, 2019, Plaintiff CHRISTINA PARK received a Right to Sue Letter from the EEOC for federal charge number 520-2018-03448.

6. Plaintiff satisfied all administrative prerequisites and is filing this case within the applicable Statute of Limitations.

7. Venue is proper in this court, as the events giving rise to this action arose in West Point, Orange County, New York, within the Southern District of New York.

## PARTIES

8. Plaintiff CHRISTINA PARK (hereinafter referred to ask "Plaintiff" or "PARK") is seeking damages to redress the injuries Plaintiff has suffered as a result of being discriminated against by her employer on the basis of sex and gender, together with hostile work environment and retaliation.

9. Plaintiff is an individual woman who is a resident of the State of New Jersey.

10. Defendant LINK SOLUTIONS, INC. (hereinafter referred to as "Defendant" or "LINK") is a service company duly existing as a corporation by the virtue and laws of the State of Virginia.

11. At all times material, Defendant LINK employed over fifteen (15) people.

12. At all times material, Defendant REBECCA BOONE (hereinafter referred to as "Defendant" or "BOONE") was the Vice President of Defendant LINK.

13. At all times material, Defendant BOONE held supervisory authority over Plaintiff, including the power to hire and fire Plaintiff.

14. At all times material, Defendant RICHARD ROBITAILLE (hereinafter referred to as "Defendant" or "ROBITAILLE") was the Program Manager of Defendant LINK.

15. At all times material, Defendant ROBITAILLE held supervisory authority over Plaintiff, including the power to hire and fire Plaintiff.

16. At all times material, Defendant, KRISTEN MANGOLD (hereinafter referred to as "Defendant" or "MANGOLD") was the Project Manager of Defendant LINK.

17. At all times material, Defendant MANGOLD held supervisory authority over Plaintiff, including the power to hire and fire Plaintiff.

**STATEMENT OF FACT**

18. Around September 11, 2017, Defendant LINK hired Plaintiff as a Senior Web Designer to work at a LINK project location in West Point, New York.

19. Around, Plaintiff and Defendant entered into an employment agreement (the "Employment Contract") whereby Defendant agreed to pay Plaintiff $2,708.34 semi-monthly, which averaged to an annual salary of $65,000.

20. Shortly after Plaintiff commenced employment with Defendant LINK, Defendant ROBITAILLE

began sexually harassing Plaintiff by inappropriately flirting with Plaintiff in the workplace.

21. By way of example only, around December 19, 2017, Defendant ROBITAILLE questioned Plaintiff and another female employee about the upcoming Defendant LINK dinner party, asking specifically who the women were bringing as their "Plus One" or date to the party.

22. When Plaintiff indicated she was not bringing anyone, Defendant ROBITAILLE began a line of questioning inquiring as to why Plaintiff was coming alone, without a date.

23. On or about December 19, 2017, Defendant LINK hosted a company dinner for its employees, including Defendant ROBITAILLE and Plaintiff.

24. Defendant ROBITAILLE flirted with Plaintiff during the entire dinner. By way of example, he told her that he was, "miserable in his marriage," implying that he was looking for a sexual relationship, and asked her, "What did you get me for Christmas."

25. Defendant ROBITAILLE's above comments were unwelcomed and made Plaintiff feel uncomfortable.

26. On or about January 4, 2018, Plaintiff learned that one of her other female coworkers—who was also a victim of Defendant ROBITAILLE's sexual harassment— was terminated by Defendant.

27. In early January 2018, Plaintiff emailed Defendant ROBITAILLE regarding a design for a homepage that she had been working on. Defendant ROBITAILLE stated that he liked Plaintiff's ideas and instructed her to create three different designs. On or about January 8, 2018, Defendant ROBITAILLE invited Plaintiff to get coffee so that they could discuss the project for work.

28. Plaintiff agreed to meet Defendant ROBITAILLE to discuss the project, however, upon Plaintiff's arrival at the coffee shop, Defendant ROBITAILLE made it apparent that the invitation was a merely ploy to continue to flirt with Plaintiff, rather than discuss business.

29. Plaintiff became increasingly uncomfortable with Defendant ROBITAILLE because he insinuated

that the meeting was business related and they were going to discuss "wireframes," however nothing regarding work was discussed and Defendant ROBITAILLE used the meeting as an opportunity to engage in small talk with Plaintiff and discuss trivial personal topics.

30. In or around January 2018, Plaintiff showed Defendant ROBITAILLE the final product of the project that she had been working on. She asked him if he approved, to which he responded "yes."

31. On or about January 13, 2018, Defendant ROBITAILLE invited Plaintiff on a date, texting Plaintiff, "We should go shooting sometime."

32. Thereafter, Defendant ROBITAILLE began sending Plaintiff text messages at all times of the night of an increasingly personal and flirting nature.

33. During this time, Defendant ROBITAILLE rarely discussed the details for the project, or if he did discuss work, it was short and to the point.

34. By way of example only, On or about January 16, 2018, Defendant ROBITAILLE texted Plaintiff numerous times after 8:00 P.M. and well into the night stating:

    a. "I'D LOVE TO SEE YOU DANCE, I WOULD BE MESMERIZED."

    b. "I THINK YOU ARE AWESOME."

    c. "LOVE YOUR FOCUS. SELF STARTER. HOW YOU ADD VALUE TO EVERY TALK AND MEETING. YOU'RE NOT SHY TO SAY AND GIVE YOUR INPUT AND DO SO PROFESSIONALLY."

    d. "YOU ENGAGE PEOPLE AND FRANKLY ARE A BREATH OF FRESH AIR. TOLD MY BOSS TODAY HOW GREAT YOU'RE DOING."

    e. "I'M IMPRESSED BY YOU."

    f. "WE SHOULD SIT OVER COFFEE EACH MORNING. LOL."

    g. "AND I LIKE YOUR FRAMING AND WORK. YOU'RE A BREATH OF

FRESH AIR."

35. In addition to the constant flirtatious texts, Defendant ROBITAILLE attempted to court Plaintiff by opening up about his childhood and he further pried about Plaintiff's personal life and childhood unprompted.

36. Defendant ROBITAILLE also informed Plaintiff that he was trying to find her on Facebook but could not.

37. On or about January 28, 2018, Defendant ROBITAILLE continued to text Plaintiff late at night, flirting, asking what she likes to do for fun and asking inappropriate questions about Plaintiff's personal life.

38. At all times material, Plaintiff was extremely uncomfortable by her supervisor's unwelcome flirtatious comments.

39. On or about January 29, 2018, Defendant ROBITAILLE invited Plaintiff out for lunch. He told her that he would like to discuss the mock-ups for the project that she had been working on in further detail. Plaintiff agreed to attend lunch with Defendant ROBITAILLE because he was her project manager and direct supervisor.

40. Later that day, Defendant ROBITAILLE texted Plaintiff that he likes talking to her. From his tone, it seemed to Plaintiff that he wanted more from her than a typical work relationship.

41. Plaintiff understood that Defendant ROBITAILLE seemed disappointed that she did not want to talk to him about her personal life and that she did not reciprocate or acquiesce to his obvious and inappropriate flirtations.

42. Defendant ROBITAILLE was extremely complimentary to Plaintiff regarding her performance and the work she had been doing on the project he was overseeing. He continuously praised her by making comments like, "I LOVE YOUR FOCUS," "YOU'RE A SELF-STARTER," "YOU

ADD VALUE TO EVERY TALK AND MEETING," and that he was telling management about her great work.

43. On or about January 31, 2018, Defendant ROBITAILLE began teasing and flirting with Plaintiff in the presence of another one of Defendant LINK's employees, Defendant MANGOLD. Defendant ROBITAILLE began asking Plaintiff if he should "PAY HER FOR THIS PAY PERIOD" and demeaning her competence as an employee, mocking her for having four (4) computer screens to complete her work.

44. Immediately following this interaction, Plaintiff complained to Defendant ROBITAILLE about how his teasing and flirting was making her increasingly uncomfortable. In response to Plaintiff's complaint, Defendant ROBITAILLE acknowledged Plaintiff's discomfort and stated that he would alter his workplace behavior toward Plaintiff.

45. On or about January 31, 2018, that afternoon, Defendant ROBITAILLE texted Plaintiff asking, "WHAT ARE YOU DOING TONIGHT?"

46. Plaintiff responded that she was going to an event in the city. Defendant ROBITAILLE then asked Plaintiff, "WILL YOU BE DANCING ALL NIGHT?"

47. Later that same evening, around 10:40 P.M., Defendant ROBITAILLE continued to text Plaintiff to ask if she was still willing to meet him for lunch. Plaintiff responded "yes" and she assumed the conversation would end there as they were already scheduled for a business meeting the following day.

48. Apparently dissatisfied with Plaintiff's unwillingness to engage in further flirtations via text message late in to the evening, Defendant ROBITAILLE became increasingly hostile with Plaintiff, texting her at 12:16 A.M. "STARTING TO WONDER ABOUT YOUR ALLEGIANCE. YOU SEEM PRE-DISPOSED. NOT MEETING YOU TOMORROW. NO

IDEA WHY YOU DID THIS. SEE YOU WHENEVER."

49. When Plaintiff saw the message the following morning, on or about February 1, 2018, she was naturally concerned about Defendant ROBITAILLE's late-night text messages from the night before, and immediately asked ROBITAILLE why he was upset with her.

50. Later that morning, Defendant ROBITAILLE texted her again, stating that he was "NOT UPSET" and stating, "SORRY YOU FEEL I AM."

51. Later that day, Plaintiff complained via email two HR supervisors of Defendant LINK, Krystal Williams and Stephanie Thompson, to inform them that Defendant ROBITAILLE was making her uncomfortable with his constant sexual harassment in the workplace and through text messages after work hours and late at night.

52. Plaintiff explained that she felt threatened by Defendant ROBITAILLE and that she only responded to any of his messages because she believed his interest was in team building and collaboration but once she realized he was flirting with her, she started to be brief when responding to Defendant ROBITAILLE's text messages.

53. During most work hours Plaintiff was forced to share a workspace alone Defendant ROBITAILLE.

54. Defendant BOONE informed Plaintiff that "WE [DEFENDANTS] SPOKE TO [DEFENDANT ROBITAILLE] ABOUT YOUR COMPLAINT, WE ARE KEEPING HIM ON THE PROJECT BECAUSE EVERYONE IS ENTITLED TO ONE MISTAKE. SO GO BACK IN THERE [TO THE SHARED OFFICE SPACE] AND DO A GREAT JOB."

55. When Plaintiff started being brief in her responses to Defendant ROBITAILLE's text messages, and as he apparently realized that Plaintiff was not interested in anything other than a purely professional relationship with him, Defendant ROBITAILLE's demeanor and behavior toward

her and his evaluations of her work took a markedly negative, harsh and retaliatory turn.

56. Immediately thereafter Defendant ROBITAILLE's evaluations of Plaintiff's work product were unduly and unreasonably critical, in stark contrast to the previous glowing evaluations of Plaintiff's work given by Defendant ROBITAILLE. Notably, there was no discernible change in the quality of Plaintiff's work over the relevant time period.

57. Defendant LINK's employee Ms. Thompson responded to Plaintiff's email complaint about Defendant ROBITAILLE's harassment and the hostile work environment he had created, stating that she wanted Plaintiff to document all conversations with Defendant ROBITAILLE going forward and that if she needed any assistance in the interim, Plaintiff was welcome to contact Ms. Thompson on her cell phone.

58. Defendant LINK's employee Ms. Thompson did not outline any measures that she or anyone else in the company would take to prevent Defendant ROBITAILLE from harassing Plaintiff going forward.

59. On or about February 1, 2018, Plaintiff also emailed Ms. Thompson a zip file of her text messages with Defendant ROBITAILLE.

60. On or about February 5, 2018, Plaintiff, not having received any substantive response regarding her complaints of sexual harassment and the hostile work environment, contacted Defendant BOONE, to follow up regarding Defendants' lack of a response to Plaintiff's complaints. Defendant BOONE replied to this inquiry by informing Plaintiff that she was still required to work in close quarters with her sexual harasser, Defendant ROBITAILLE.

61. That same day, Plaintiff emailed BOONE with concerns that, because ROBITAILLE knew Plaintiff complained about ROBITAILLE's sexual harassment, ROBITAILLE would now have reason to unfairly retaliate against Plaintiff in his evaluations of Plaintiff's work product.

BOONE never responded to this email.

62. Plaintiff also expressed fear to BOONE that ROBITAILLE could physically harm Plaintiff. Defendants took no substantive action to respond to the fears of physical harm expressed by Plaintiff.

63. On or about February 6, 2018, Defendant ROBITAILLE emailed Plaintiff to complain about her work product, despite the fact that days earlier he loved the exact same work product. By way of example, Defendant ROBITAILLE stated that, "NONE OF THESE MOCKUPS ARE PROFESSIONAL OR DYNAMIC." He continued by telling Plaintiff, "I TOLD YOU FROM THE START I WANT UNIQUE AND AMAZING. I WANT AMAZING. YOU GAVE ME BORING."

64. Defendant ROBITAILLE continued to harass Plaintiff and complain about her work stating that he "HIRED HER TO PERFORM," and "YOUR MOCKUPS ARE LACKING ANY ORIGINALITY."

65. Defendant ROBITAILLE even threatened Plaintiff's job security. By way of example, after Defendant ROBITAILLE became aware of Plaintiff's complaints of sexual harassment against him, Defendant ROBITAILLE emailed Plaintiff stating, "I THINK WE NEED SOMEONE NEW WITH FRESH IDEAS."

66. On or about February 7, 2018, Plaintiff called Defendant BOONE, who was Defendant ROBITAILLE's direct supervisor, and complained that Defendant ROBITAILLE was being unduly critical of Plaintiff's work in retaliation for the complaints she made against Defendant ROBITAILLE for sexual harassment, and that Defendant ROBITAILLE offered no substantive evidence or advice as to what was wrong with Plaintiff's work.

67. As Plaintiff was explaining the retaliation she was facing under Defendant ROBITAILLE,

Defendant BOONE interrupted her saying, "I KNOW YOU HAVE SOME ISSUES WITH RICH BUT YOU NEED TO FOCUS ON YOUR PROJECT."

68. On or about February 14, 2018, having still not received any meaningful response to her complaints about sexual harassment and the subsequent retaliation from Defendant ROBITAILLE for Plaintiff's refusal to respond positively to his obvious *quid pro quo* advances, Plaintiff emailed Defendant BOONE to complain about the further retaliation being inflicted upon her by Defendant ROBITAILLE.

69. Specifically, Plaintiff's complaint stated: "He has been retaliating in this way towards me ever since I did not respond to his advances at work and because I am a female employee."

70. On or about February 15, 2018, the distress from the incidents of harassment and retaliation, as well as Defendants' demonstrated and consistent failure to make any meaningful efforts to address Plaintiff's numerous complaints and objections to same, caused Plaintiff to seek mental health treatment and she made an appointment to see a mental health professional the following week.

71. On or around February 16, 2018 Plaintiff made another email complaint to HR and Defendant BOONE regarding the sexual harassment and ongoing retaliation by Defendant ROBITAILLE, wherein Plaintiff explicitly detailed and complained about the sexual harassment, retaliation and Defendants' continued failure to do anything to address Plaintiff's concerns.

72. Plaintiff expressed fear of both professional and physical retaliation by Defendant ROBITAILLE, because through his numerous attempts at small talk and flirtations with Plaintiff he made it known to Plaintiff that he owned firearms.

73. On or around February 22, 2018, Plaintiff was informed by Defendant BOONE that Defendant ROBITAILLE was going to be terminated and that Defendant MANGOLD was going to be

promoted to ROBITAILLE's former position as Project Manager.

74. Plaintiff asked BOONE what precautions would be taken to ensure that ROBITAILLE would not physically harm Plaintiff after ROBITAILLE's termination. BOONE responded, "THAT'S NOT MY PROBLEM" and informed Plaintiff that Defendant ROBITAILLE's termination had nothing to do with the complaints Plaintiff made against him.

75. Around February 22, 2018, Defendant ROBITAILLE was terminated and Defendant MANGOLD assumed his title and responsibilities.

76. Immediately thereafter Defendant MANGOLD's attitude and treatment towards Plaintiff took a noticeably negative turn. Defendant MANGOLD increasingly became critical of Plaintiff's work product, began limiting her role in the project and soon after, started making false allegations against Plaintiff to Defendant BOONE.

77. On or about March 22, 2018, Defendant MANGOLD ignored several project contributions Plaintiff made to an important project presentation.

78. In the following months, around March and April of 2018, Defendant MANGOLD's increased criticism of Plaintiff's work product intensified to the point that Defendant MANGOLD began refusing to allow Plaintiff to attend team meetings and to communicate with stakeholders whose projects to which Plaintiff was assigned. Plaintiff complained several times to Defendant BOONE about the roadblocks Defendant MANGOLD was putting in the way of Plaintiff's ability to effectively do her job and Defendant MANGOLD's false allegations about the quality of Plaintiff's work product.

79. In or around April 2018, Defendant MANGOLD repeatedly ignored Plaintiff's concerns and complaints about MANGOLD's retaliation against Plaintiff.

80. On or about April 23, 2018, Plaintiff filed her initial EEOC Charge against Defendant LINK.

81. On or about April 25, 2018, although Defendant MANGOLD had been very critical of Plaintiff's work product, both in person and via phone conversations, Defendant MANGOLD's written evaluation of Plaintiff's in Plaintiff's 90-day review was positive.

82. On or about April 26, 2018, during a brief conversation with a coworker seated next to Plaintiff about widely publicized news reports of Bill Cosby's criminal conviction for rape, Defendant MANGOLD expressed her sympathy for men who have their lives "ruined" by accusers of sexual harassment and assault, stating, among other things, that, "THE 'ME TOO' MOVEMENT JUST GOES TOO FAR."

83. This statement was made shortly after Defendant MANGOLD's former supervisor, Defendant ROBITAILLE was terminated after Plaintiff complained of ROBITAILLE's sexual harassment of Plaintiff. Given the context of this conversation, it was clear that Defendant MANGOLD was openly expressing animus toward Plaintiff for her complaints about sexual harassment, which were the apparent reason for Defendant ROBITAILLE's termination.

84. On or about April 27, 2018 Plaintiff's supervisors learned of Plaintiff's initial EEOC charge via a claim letter from Plaintiff's counsel that included a copy of the EEOC charge.

85. On or about April 30, 2018 Plaintiff emailed Defendant BOONE to complain about Defendant MANGOLD's constant targeted bullying and sabotaging of Plaintiff's job. This email was ignored.

86. On or about May 3, 2018, an HR manager named Mr. Hall visited the project location to privately discuss Plaintiff's allegations against Defendant ROBITAILLE with Plaintiff and Defendant MANGOLD.

87. MANGOLD became angry about the comments Plaintiff made to Mr. Hall and MANGOLD expressed her anger toward Plaintiff an aggressively worded email later the same day that was

baselessly critical of Plaintiff's work.

88. Over the following weeks Defendant MANGOLD continued to be extremely and unreasonably critical of Plaintiff's work product and openly berate Plaintiff in front of coworkers.

89. On or about May 18, 2018, Defendant MANGOLD continued her false and unreasonable accusations against Plaintiff and issues Plaintiff a "30-day final warning" write-up, telling Plaintiff that she "WILL BE TERMINATED IN 30 DAYS IF [HER] BEHAVIOR DOES NOT IMPROVE."

90. The stated "infractions" Defendant MANGOLD accused Plaintiff of committing in the write-up are directly contradicted by communications via text message and email. In response, Plaintiff sent emails objecting to Defendant BOONE and HR that the allegations in the write-up were false. Those emails were ignored.

91. On numerous occasions, Plaintiff sought clarification from Defendant MANGOLD regarding the workflow and how she could comply with Defendant MANGOLD's unreasonable and impossible demands upon Plaintiff. Those emails were ignored and Plaintiff became overcome with anxiety regarding her apparent impending termination.

92. In or around July, 2018, feeling helpless and desperate due to Defendant MANGOLD's constant targeted harassment and bullying of her, including Defendant MANGOLD's threat to terminate Plaintiff's employment, Plaintiff asked Defendant BOONE to be transferred to another team outside of Defendant MANGOLD's supervision or to be allowed to work from home. Defendant BOONE refused the requests.

93. Due to the unabated bullying and threats of termination from Defendant MANGOLD, and the futility of her complaints and requests for intervention from HR and Defendant BOONE, Plaintiff, fearing the grave impact that being terminated from her job would have on her professional

reputation and her career, and overcome with anxiety and hopelessness, and with no other reasonable alternative, Plaintiff was forced to resign from her job on or about July 20, 2018.

94. On or about July 20, 2018, Defendants constructively terminated Plaintiff's employment.

95. The above are just some of the examples of unlawful discrimination and retaliation to which the Defendants subjected Plaintiff to on an ongoing and continuous basis.

96. At all material times, no appropriate or reasonable actions were taken by Defendant, and Plaintiff continued to work in a very negative and hostile work environment.

97. Plaintiff felt emotionally overwhelmed, frightened, depressed and anxious.

98. Defendant discriminated against and retaliated against Plaintiff because of her sex/gender and complaints of discrimination.

99. Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

100. At all material times, Plaintiff opposed and complained of Defendant's ongoing discrimination, retaliation, and unlawful conduct.

101. At all times material, Defendant and its supervisors acted with deliberate indifference to the discrimination Plaintiff faced and her complaints thereabout.

102. As a result of Defendant's continued harassment of Plaintiff, she suffered numerous injuries including physical, economic, and emotional damages.

103. As a result of Defendant's discriminatory and intolerable treatment of Plaintiff, Plaintiff suffers from high stress, anxiety, and physical ailments.

104. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

105. As Defendant's conduct has been malicious, reckless, willful, outrageous, and conducted with full

knowledge of the law, Plaintiff will demand punitive damages against Defendant.

106. Plaintiff demands reinstatement to her original position.

## AS A FIRST CAUSE OF ACTION
## DISCRIMINATION UNDER TITLE VII
## <u>(Not Against Individual Defendants)</u>

107. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

108. Title VII states in relevant part as follows:

> "(a) Employer practices:
>
> It shall be an unlawful employment practice for an employer:
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

109. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex and gender.

110. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e et seq., by terminating and otherwise discriminating against Plaintiff as set forth herein because of Plaintiff's sex and gender.

## AS A SECOND CAUSE OF ACTION FOR
## RETALIATION UNDER TITLE VII
### (Not Against Individual Defendants)

111. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint.

112. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

113. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendants.

114. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Title VII.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## NEW YORK STATE LAW
### (Against All Defendants)

115. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint as if fully set forth at length.

116. Executive Law §296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in

terms, conditions or privileges of employment."

117. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her sex/gender and by creating a hostile work environment.

### AS A FOURTH CAUSE OF ACTION
### FOR AIDING & ABETTING UNDER
### NEW YORK STATE LAW
### (Against All Defendants)

118. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint as if fully set forth at length.

119. New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

120. Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

### AS A FIFTH CAUSE OF ACTION
### FOR RETALIATION UNDER
### NEW YORK STATE LAW
### (Against All Defendants)

121. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint as if fully set forth at length.

122. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

123. Defendants engaged in an unlawful discriminatory practice by wrongfully retaliating against the Plaintiff.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues to be tried.

Dated: New York, New York
May 7, 2019

Respectfully Submitted,
**DEREK SMITH LAW GROUP, PLLC.**
Attorneys for Plaintiff

BY: _____

Seamus Barrett, Esq.
1 Pennsylvania Plaza, 49th Floor
New York, New York 10119
(212) 587-0760